[Cite as *State v. McClain*, 2025-Ohio-962.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :

                                         No. 113597

    v.                               :

ROBIN MCCLAIN,                          :

    Defendant-Appellant.             :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** VACATED AND REMANDED
**RELEASED AND JOURNALIZED:** March 20, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652519-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sarah J. Denney, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Erika B. Cunliffe, Assistant Public Defender, *for appellant*.

MICHAEL JOHN RYAN, J.:

**{¶ 1}** Defendant-appellant, Robin McClain, appeals his rape conviction, which was rendered after a jury trial. After a thorough review of the facts and pertinent law, we vacate the conviction and remand.

**{¶ 2}** In 2020, McClain was charged in a two-count indictment for a March 1, 2010 rape. Count 1 charged forcible rape and Count 2 charged substantial impairment rape. The case proceeded to a jury trial where the following facts were adduced.

**{¶ 3}** At the time in question, the female victim was in her early 30s and single. She lived in an apartment in Westlake, Ohio and worked as a manager at two restaurants. On the evening of February 28, 2010, the victim supervised the closing of both restaurants and then returned to her apartment around midnight, March 1. She changed her clothes, fed her dog, and then left her apartment to get food at a combination bar-restaurant in the West Park neighborhood of Cleveland. The victim testified that once at the establishment, she sat at the bar where she ordered a pizza and a vodka tonic.

**{¶ 4}** According to the victim, shortly after she sat down at the bar, a man approached her and was "hitting on [her] pretty aggressively"; she indicated to him that she was not interested. The victim described the man as "chubby and about five-foot-eight," "very Arabic[-looking]," balding, and bearded. She testified that a second man, "in a dark hoodie" with "dark hair," approached her on the other side.

The victim did not recall much about the second man except that he was a little taller than the first and had "dark features."

{¶ 5} At trial, the victim testified that she took a single sip of her drink and did not remember anything thereafter until she was "being woken up in a parking lot, beaten up, with [her] pants unzipped and clearly violated." Someone — the victim was not sure if it was a man or woman — woke her up and walked her back to her apartment. The victim testified that her left arm was bruised, she had blood on her lips, and she felt a "sensation" in her vagina. She further testified that she did not have any memory of engaging in a sexual act that evening and she did not consent to having sex with anyone that evening.

{¶ 6} Once at her apartment, the victim went to bed and when she woke up in the morning, she called a friend and her mother. The victim's friend testified that the victim told him that she was "hurt, obviously by somebody," and he assumed it was a "sexual assault." The friend insisted that she go the hospital and took her. The mother's sister (the victim's aunt) testified that the victim's mother called her and said that the victim had been "attacked," "raped," and was at the hospital. The defense did not object to either the friend's or aunt's statements.

{¶ 7} At the hospital, the victim was examined by a sexual assault nurse examiner ("SANE nurse"). The SANE nurse testified that the victim could not recall any assailants or what had transpired. The medical records demonstrate that the victim relayed the following to the SANE nurse:

I went to the place to get pizza. While waiting for pizza had a couple vodka tonics. Talked with man beside me. Next thing I knew I was walking down the street and couldn't remember last several hours. I walked home. Noticed bruises and fat lip.

{¶ 8} The SANE nurse testified that the victim did not have vaginal injuries, but she did have a cut and swelling on her lip, a small bruise on her right hip, and bruising on her knees and right elbow. The nurse testified that it was possible the injuries could have been sustained in a fall.

{¶ 9} The SANE nurse took oral, anal, and vaginal swabs of the victim. The nurse testified that it was not her practice to perform a drug-facilitated sexual assault kit if 12 or more hours had elapsed since the alleged sexual assault; thus, no such kit was administered to the victim. Further, the SANE nurse admitted that although a toxicology screen would have revealed if the victim had been drugged (because less than 24 hours had elapsed between the time she was examining the victim and the alleged assault), she failed to administer one.

{¶ 10} According to the SANE nurse, pursuant to the victim's request, no skin stain swabs or pictures were taken. The record also demonstrates that a police officer was present at the hospital, but the victim declined to speak with the police and stated that she "did not want to go to court." Therefore, the police took the SANE kit but did not interview the victim at the hospital.

{¶ 11} According to the victim, she did not hear anything from the police for ten years. The victim testified that, in the meantime, she conducted her own investigation, which included contacting the police, but they never responded.

However, the investigating police officer testified that the police attempted to contact the victim at the phone number and address she provided but were unsuccessful.[1]

{¶ 12} The victim's investigation also included her going to the subject bar-restaurant shortly after the incident occurred. In that regard, the victim testified, without objection, as follows:

> I spoke with the bartender which I – Michelle is what I remember. She mentioned that this incident had happened with her. We shared a conversation about that. I asked her if there were any cameras that could corroborate where I was, who I left with. I asked if I got my pizza. I asked if I paid for it. She could not answer any of those. There was no video. She mentioned the owner was in the process of putting them and installing them because there were a few other girls that had reported being roofied and I asked for the owner to call me. I also called and left a message for him and never received a call back.

{¶ 13} Regarding law enforcement's investigation, the sexual assault kit was submitted to the Ohio Bureau of Criminal Investigation ("BCI") in June 2010, and was examined by analyst Lindsey Nelsen-Rausch. Nelsen-Rausch testified that she did not find male DNA on the anal, anal-perineal, or oral swabs, but did on the vaginal swab.

{¶ 14} The case went cold until, in February 2020, John Popielarczyk, an investigator at the Cuyahoga County Prosecutor's Office, contacted the victim, obtained a statement from her, and showed her a lineup. The lineup did not contain

---

[1] For an unexplained reason, the police had the victim's old address in its report; the victim testified that she did not give them the old address.

a picture of McClain.  The victim picked three or four men from the lineup as the possible perpetrator.

{¶ 15} In September 2021, another investigator, Brian Katigbak, took over the case due to Popielarczyk's retirement.  By that time, the prosecutor's office had a genealogic investigative lead of two possible suspects:  McClain and his brother, Michael McClain.  Katigbak surveilled Michael McClain and was able to obtain a DNA sample from him.  Analysis of the sample revealed that Michael McClain's DNA did not match the DNA sample obtained from the victim's sexual assault kit.  Katigbak then surveilled McClain and was able to obtain a DNA sample from him.  The sample was  compared to the DNA sample from the victim's rape kit and was a match.

{¶ 16} In October 2021, Katigbak interviewed McClain, who was friendly and cooperative.  McClain told the investigator that he knew the area where the subject bar-restaurant was located but denied that he had ever been at that particular establishment.  Katigbak showed McClain a picture of the victim; McClain stated he did not know her and denied ever having had a sexual encounter with her.  The investigator obtained a buccal swab from McClain and sent it to BCI for DNA testing.  The analysis confirmed that McClain's DNA was consistent with the male DNA from the victim's sexual assault kit.

{¶ 17} Investigator Katigbak created a photo lineup, which included McClain's photo, and presented it to the victim.  The victim did not select McClain; rather, she selected another man.  The victim told the investigator that, "as far as she

knew," the man she selected was the man who assaulted her. Katigbak admitted that McClain did not fit the victim's description given after the assault of a "chubby" man with curly hair.

{¶ 18} McClain's "wife" testified for the defense.[2] She met McClain in 2007. According to the "wife," in 2010, she, McClain, and their friends frequented bars in the West Park neighborhood. It was not unusual for the group, including McClain, "to meet people in the bars and then go off with them." The "wife" testified that if McClain told law enforcement that, in 2010, he did not go to bars, did not regularly drink, and only frequented coffee shops in the West Park area, that would have been untrue.

{¶ 19} On this evidence, the jury found McClain not guilty of Count 1, forcible rape and guilty of Count 2, substantial impairment rape. The trial court sentenced McClain to a six-year prison term. McClain presents the following three assignments of error for our review:

I.      Robin McClain's rape conviction rests on insufficient evidence and thereby violates his right to due process as protected by the 14th Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution.

II.     Robin McClain was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

III.    Robin McClain was deprived his right to a fair trial under the State and federal constitutions when the trial court permitted the

---

[2] McClain's "wife" described a relationship that possibly could have constituted a common law marriage when it was recognized in Ohio, which was up until 1991.

State to introduce improper victim impact evidence which the State then argued substantively in support of his conviction.

{¶ 20} In his first assignment of error, McClain contends that the State failed to present sufficient evidence to support a substantial impairment rape conviction. The dissent contends that McClain failed to preserve the issue for review because his theory of the case during trial was that he and the victim apparently engaged in consensual sexual conduct that neither one remembered. There are only two ways that sexual conduct can occur: with consent or without consent; if the conduct is without consent it is rape. McClain made a motion for a Crim.R. 29 judgment of acquittal, arguing the following: "there is no direct evidence here whatsoever of a rape. We do not believe any circumstantial evidence would rise to a level that even if taken in the light most favorable to the State would allow for a verdict on either count." On this record, I believe he preserved the issue for our review.

{¶ 21} When assessing a sufficiency-of-the-evidence challenge, a reviewing court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). While a manifest-weight challenge questions whether the State has met its burden of persuasion, the test for sufficiency of the evidence requires a determination whether the State has met its burden of production at trial. *Id.*

{¶ 22} Substantial impairment rape is governed by R.C. 2907.02(A)(1)(c), which provides that a rape occurs when the other person's "ability to resist or consent is substantially impaired because of a mental or physical condition . . . and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition." In this case, the issues are whether the State produced sufficient evidence regarding the element of the victim's substantial impairment and whether McClain knew or had reasonable cause to know of such condition.

{¶ 23} The term "substantially impaired" is not statutorily defined, and therefore, the term must be given the meaning "generally understood in common usage." *State v. Zeh*, 31 Ohio St.3d 99, 103 (1987). The State can show substantial impairment by offering evidence "demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct." *Id.* at 103-104. This court has found that voluntary intoxication is a mental or physical condition that could cause substantial impairment. *State v. Jones*, 2015-Ohio-1818, ¶ 43 (8th Dist.), citing *State v. Doss*, 2008-Ohio-449, ¶ 13 (8th Dist.).

{¶ 24} "[U]nder the case law, substantial impairment contemplated in the rape statute is not synonymous with intoxication." *State v. Foster*, 2020-Ohio-1379, ¶ 44 (8th Dist.). That is, not every alcohol or drug consumption leads to substantial impairment. *See, e.g., State v. Hansing*, 2019-Ohio-739, ¶ 14 (9th Dist.); *State v. Jenkins*, 2015-Ohio-5167, ¶ 27 (2d Dist.); *State v. Doss*, 2008-Ohio-449, ¶ 18 (8th Dist.). Substantial impairment does not have to be proved by expert testimony; rather, it can be proved through the victim's own testimony or the testimony of people who interacted with the victim. *State v. Brady*, 2007-Ohio-1453, ¶ 78 (8th Dist.); *State v. Jones*, 2015-Ohio-1818, ¶ 43 (8th Dist.); *Hansing* at ¶ 13.

{¶ 25} The State contends that the victim's testimony that she did not remember anything after declining the advances of two men at the bar until she woke up in a parking lot, feeling beaten up, with her pants unzipped, and, as she testified, "clearly violated," was sufficient to demonstrate the victim's substantial impairment. We are hesitant to find that this testimony was sufficient to prove beyond a reasonable doubt that the victim was substantially impaired *at the time of the sexual conduct*. But even assuming for the sake of argument that it was, the State still had to prove beyond a reasonable doubt that McClain knew of her impairment at the time of the sexual conduct. We find that the State failed to prove this second element beyond a reasonable doubt.

{¶ 26} Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of

circumstances when the person is aware that such circumstances probably exist." Knowledge of substantial impairment may be reasonably inferred from a combination of the complainant's demeanor and other interactions with the complainant. *Jones* at ¶ 43, citing *State v. Novak*, 2005-Ohio-563, ¶ 25. For example, this court has held that such things as an alleged victim falling, slurring speech, passing out, or vomiting could indicate that the alleged victim is substantially impaired. *See State v. Keller*, 2018-Ohio-4107, ¶ 31 (8th Dist.), citing *State v. King*, 2002-Ohio-2313, ¶ 20 (8th Dist.).

{¶ 27} The State failed to present evidence of any of the above-mentioned indicators of substantial impairment. McClain cites *Doss*, 2008-Ohio-449 (8th Dist.), wherein this court reversed a rape conviction, as an analogous case to this case; the State contends that *Doss* is distinguishable because the alleged victim there was voluntarily intoxicated. We do not believe that whether an alleged victim becomes impaired voluntarily distinguishes *Doss* for our consideration in this case. Indeed, *Doss* found that voluntary intoxication is a mental or physical condition that could cause substantial impairment. *Id.* at ¶ 13. Whether by becoming substantially impaired voluntarily or involuntarily, the issue is whether the alleged perpetrator knew of the alleged victim's impairment. Thus, we believe *Doss* is instructive for this case.

{¶ 28} In *Doss*, as here, the alleged victim was unable to recall sexual activity with the defendant and was bruised. This court found that the victim's inability to recall the incident was not evidence of nonconsensual sexual activity nor that the

defendant knew she may have been substantially impaired. The *Doss* panel noted that a person experiencing an alcohol-induced blackout may still be able to walk, talk, and perform ordinary functions without others being able to tell that he or she is experiencing a blackout. *Id.* at ¶ 18, citing Westin, Peter, Egelhoff Again, 36 Am.Crim.L.Rev. 1203, 1231 (1999).

{¶ 29} The *Doss* Court reversed the defendant's rape conviction, finding that the evidence was insufficient to prove that the defendant knew the victim was substantially impaired. *Id.* at ¶ 25. In essence, the panel recognized that, although the evidence suggested that the victim may have been substantially impaired, the evidence was insufficient to prove that the defendant had knowledge of substantial impairment, as opposed to mere intoxication. *Id.* at ¶ 20. This court and the Second Appellate District similarly reached the same conclusion in *State v. Foster*, 2020-Ohio-1379 (8th Dist.), and *State v. Hatten*, 2010-Ohio-499 (2d Dist.), respectively. We find *Doss*, *Hatten*, and *Foster* instructive.

{¶ 30} For example, in *Foster*, this court recognized that although an alleged victim's testimony is sufficient to prove substantial impairment, "[a] person's conduct becomes criminal only when engaging in sexual conduct with an intoxicated victim when that person *knows or has reasonable cause to believe* that the victim's ability to resist or consent is substantially impaired because of her intoxication." (Emphasis in original); *id.* at ¶ 45, 47, citing *State v. Noernberg*, 2012-Ohio-2062, ¶ 11 (8th Dist.); *State v. Rivera*, 2012-Ohio-2060, ¶ 22 (8th Dist.); and *State v. Martin*, 2000 Ohio App. LEXIS 3649 (12th Dist. Aug. 12, 2000).

{¶ 31} Friends of the alleged victim in *Foster* described her as "really drunk" and "tipsy and intoxicated," and according to the alleged victim herself, she was in a "blackout." *Id.* at ¶ 49, 51. This court found that those descriptions did not equate to "substantially impaired." *Id.* at ¶ 54. This court further found that "none of the State's witnesses who interacted with [the alleged victim] prior to the sexual incident testified that she showed specific signs or indications of substantial impairment such that [the defendant] knew or should have known that her ability to consent to sexual conduct was substantially impaired." *Id.* at ¶ 56. The *Foster* majority reversed the defendant's conviction on the basis of insufficient evidence. *Id.* at ¶ 68.

{¶ 32} Similarly, in *Noernberg*, this court reversed the defendant's rape conviction for insufficient evidence. The *Noernberg* panel found that although the defendant knew the alleged victim had consumed alcohol and drugs, there was no evidence of any particular aspects of her behavior — such as stumbling, falling, slurred speech, passing out, or vomiting — that should have alerted the defendant to her substantial impairment. *Id.* at ¶ 27.

{¶ 33} The dissent contends that "[t]he record is clear that [the alleged victim] was in a state of impairment *at the time of the incident . . . .*" (Emphasis added.) We disagree and the ground for our decision turns, in large part, on the fact that there was no testimony about the victim's state at the time of the sexual conduct; the sexual conduct in and of itself is insufficient to sustain the conviction. Although the forensic evidence demonstrates sexual activity occurred between McClain and the victim, when contacted by the police ten years after the alleged incident, McClain

said he did not know the victim and did not recall having had any interaction with her. Further, the victim did not claim in her statement at the hospital or later to the police that McClain knew or should have known that she was substantially impaired. Simply, neither the victim nor any other witness testified as to any particular aspect of the victim's behavior that should have alerted McClain to her substantial impairment. *See Noernberg* at *id.*

{¶ 34} Moreover, even considering the victim's testimony about her own investigation into the case as well as testimony from the victim's friend and aunt — which as will be discussed below, we find was improper, but nonetheless we are required to consider in evaluating a sufficiency-of-the- evidence challenge — does not reveal any evidence that McClain knew about, or should have been alerted to, the victim's condition. *See State v. Kareski*, 2013-Ohio-4008, ¶ 24, citing *Lockhart v. Nelson*, 488 U.S. 33 (1988) ("[I]n conducting a sufficiency review, a reviewing court must consider all the evidence admitted at trial, even improperly admitted evidence. . . .").

{¶ 35} Further, the dissent's contention that this majority opinion "has the unintended consequence of effectively eviscerating R.C. 2907.02(A)(1)(c)" is, we believe, a straw man argument. We believe this opinion effectuates exactly what an appellate court is tasked to do when considering a sufficiency-of-the-evidence challenge: view the evidence in a light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. One of the elements of the crime here

required the State to prove that McClain knew of the victim's substantial impairment at the time of the sexual conduct. As this court has previously recognized, the waters can be murky in determining whether a defendant knew or should have known that an alleged victim was substantially impaired. *See Noernberg* at ¶ 13, quoting *Doss*, 2008-Ohio-449 (8th Dist.), at ¶ 18. Simply put, the record in this case is devoid of such evidence, but in so finding we do not eviscerate the substantial impairment statute. (We note that, in addition to the lack of evidence that generally is relied on to indicate substantial impairment—such as vomiting, stumbling, slurred speech, etc. — the victim's description of the two men at the bar did not match McClain.)

{¶ 36} Moreover, the dissent's insinuation that McClain was the person who drugged the victim is misplaced, because McClain was not charged under that subsection of the rape statute, R.C. 2907.02(A)(1)(a). That subsection provides that "[n]o person shall engage in sexual conduct with another when. . .[f]or the purpose of preventing resistance, the offender substantially impairs the other person's judgment or control by administering any drug, intoxicant, or controlled substance to the other person surreptitiously or by force, threat of force, or deception." R.C. 2907.02(A)(1)(a). McClain was charged under R.C. 2907.02(A)(1)(c), which as previously set forth, prohibits sexual conduct with another when "[t]he other person's ability to resist or consent is substantially impaired. . . and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired. . . ."

{¶ 37} And, further, contrary to the dissent's assertion, we have not found that McClain and the victim had "consensual sex." Rather, we have acknowledged that the forensic evidence demonstrates that sexual conduct occurred between the victim and McClain, but the details, as required for a substantial-impairment-rape conviction, are insufficient.

{¶ 38} It is well-established that a trier of fact may not draw an inference solely and entirely upon another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts. *See State v. Brown*, 2018-Ohio-3674, ¶ 19 (8th Dist. ) ("Ohio law precludes the stacking of inferences to prove a claim."). We acknowledge that reasonable inferences may be drawn from the facts and conditions established. *State v. Armstrong*, 2016-Ohio-7841, ¶ 23 (11th Dist.) But they cannot be drawn from facts or conditions merely assumed. *Id.* We believe that the dissent's belief that "[t]he record is clear that [the alleged victim] was in a state of impairment at the time of the incident . . . " is based on impermissible inference stacking. That is, the dissent believes that because McClain's DNA was a match to the DNA in the victim's rape kit, McClain necessarily must have raped the victim.

{¶ 39} We also note that the dissent seems to take into account McClain's credibility, noting for example, that McClain's "wife" testified that if McClain told law enforcement that he neither went to bars nor drank in 2010, that would have been a lie. It is a long-standing tenet of the law that evaluation of witness credibility

is not proper on review for sufficiency of evidence. *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79-80.

{¶ 40} And although we agree with the dissent that whether a person acted knowingly can be inferred from the totality of the circumstances surrounding the alleged offense, there is a dearth of evidence in this case from which such an inference about McClain can be made. In the case the dissent cites, *State v. Keller*, 2018-Ohio-4107 (8th Dist.), the defendant knew that the victim had consumed at least five drinks and smoked marijuana. Moreover, according to the defendant's own testimony, "as far as [he] could tell the victim was intoxicated — no more, no less than anybody else" with the exception of one other individual in the group the evening of the sexual assault. *Id.* at ¶ 28. Evidence upon which an inference as to McClain's knowledge can be made is completely lacking in this case.

{¶ 41} On this record, we sustain McClain's first assignment of error.

{¶ 42} In his second assignment of error, McClain contends that his trial counsel was ineffective for not objecting to the victim's testimony about her own investigation into the incident, as well as other witnesses' statements.

{¶ 43} To establish a claim of ineffective assistance of counsel, McClain must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, (1984), paragraph two of the syllabus.

{¶ 44} McClain challenges the lack of objection on the ground of hearsay to the following testimony of the victim:

> I spoke with the bartender which I – Michelle is what I remember. She mentioned that this incident had happened with her. We shared a conversation about that. I asked her if there were any cameras that could corroborate where I was, who I left with. I asked if I got my pizza. I asked if I paid for it. She could not answer any of those. There was no video. She mentioned the owner was in the process of putting them and installing them because there were a few other girls that had reported being roofied and I asked for the owner to call me. I also called and left a message for him and never received a call back.

{¶ 45} The State contends that, because defense counsel objected throughout the trial, "it is apparent that Appellant's counsel understood that this testimony was not utilized to prove the truth of the matter asserted." We disagree.

{¶ 46} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, statements made outside of the courtroom, offered at trial to prove the truth of what they assert, are inadmissible "hearsay" unless an exception applies. *State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987); *State v. Williams*, 2018-Ohio-4612, ¶ 32; Evid.R. 802.

{¶ 47} The testimony here was classic hearsay. Without toxicology evidence to corroborate the victim's belief that she had been drugged, the testimony was offered for the truth of the matter — that the victim had been drugged. And there was no foundation set that the testimony was subject to any hearsay exception.

{¶ 48} Likewise, other testimony elicited by the State, and not objected to by defense counsel, was impermissible hearsay not subject to an exception.

Specifically, the testimony by the victim's friend (who the victim called the following day) that the victim told him that she was "hurt, obviously, by somebody" and that he assumed it was a "sexual assault," as well the aunt of the victim who testified that her sister (the victim's mother) called her and told her that the victim had been "attacked" and "raped."

{¶ 49} Given the gaps in the State's evidence, we are constrained to find that the hearsay evidence was prejudicial; that is, it impermissibly filled in the gaps of lacking evidence, especially the testimony of the victim, who was unable to state the particulars of the incident.

{¶ 50} Therefore, on this record, we sustain the second assignment of error.

{¶ 51} For his final assignment of error, McClain contends that the trial court allowed impermissible victim-impact testimony. Given our resolution of McClain's first and second assignments of error, the third assignment of error is moot and we decline to address it. *See* App.R. 12(A)(1)(c).

{¶ 52} We recognize the sensitivity of these types of matters but are constrained by the facts or lack thereof in the case, along with the applicable case law, in finding that the State has failed to meet its burden of proof on the element of McClain's knowledge of the victim's substantial impairment. Therefore, for the reasons set forth herein, we vacate the conviction.

{¶ 53} The cause is vacated and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EMANUELLA D. GROVES, P.J., CONCURS;
MARY J. BOYLE, J., DISSENTS (WITH SEPARATE OPINION)

MARY J. BOYLE, J., DISSENTING:

{¶ 54} I respectfully disagree with the lead opinion. I would overrule McClain's three assigned errors and would affirm his rape conviction.

**Substantial Impairment Rape**

{¶ 55} As a preliminary matter, I note that McClain advanced a different theory at trial than the one he raises on appeal. At trial, the defense theory was that the sex was consensual and S.G. was not drugged. Rather, S.G. was embarrassed and regretted having sex with McClain because she was drunk, so she went to the hospital based upon her friend's insistence. According to defense counsel:

> This is a consensual sex defense. It has been from the beginning. That's what we're saying, that somehow these people had consensual sex. Neither party in this case remembers what happened.

> [S.G.] is completely clear that she doesn't remember what happened in that time frame, [McClain] told the police he doesn't remember, so our

position is, there's no question that these people had a sexual encounter because the DNA is there. We don't dispute that. We never have. How it happened other than it's consensual, we have no evidence of that.

(Tr. 778-779.)[3]

{¶ 56} Whereas on appeal, McClain argues for the first time that there was insufficient evidence of S.G.'s substantial impairment at the time of the sexual conduct and insufficient evidence that he knew or had reasonable cause to believe that S.G. was substantially impaired at the time of the sexual conduct.

{¶ 57} It is well settled that where a party proceeds in trial on a certain legal theory, the party "may not abandon that theory on appeal and proceed on a different theory in the appellate court." *State v. Urso*, 2011-Ohio-4702, ¶ 77 (11th Dist.), citing *Dolan v. Dolan*, 2002-Ohio-2440, ¶ 7 (11th Dist.), citing *Stores Realty Co. v. Cleveland, Bd. of Bldg. Stds. & Bldg. Appeals*, 41 Ohio St.2d 41 (1975) ("[A] party cannot raise any new issues or legal theories for the first time on appeal."). Issues raised for the first time on appeal "are deemed waived." *State v. Zukas*, 2004-Ohio-2792, ¶ 21 (11th Dist.), citing *State v. Burge*, 88 Ohio App.3d 91 (10th Dist. 1993), citing *State v. Comen*, 50 Ohio St.3d 206 (10th Dist. 1990); *see also State v. Childs*, 14 Ohio St. 2d 56 (1968), paragraph three of the syllabus; *State v. Infante*, 2020-Ohio-992, ¶ 8 (11th Dist.). Because McClain did not raise the issue of "substantial impairment" at the trial, he failed to preserve this argument for appeal. However, even if the issue is properly before us, I would find that it lacks merit.

---

[3] I note that counsel's remarks during closing argument do not constitute evidence, and "[g]reat latitude is afforded counsel in the presentation of closing argument to the jury." *Pang v. Minch*, 53 Ohio St.3d 186 (1990), paragraph two of the syllabus.

{¶ 58} The lead opinion, in vacating McClain's rape conviction, reasons that the State failed to "prove beyond a reasonable doubt that McClain knew of [S.G.'s] impairment at the time of the sexual conduct" and finds that its "decision turns, in large part, on the fact that there was no testimony about [S.G.'s] state at the time of the sexual conduct[.]" In reaching this conclusion, which will be discussed in more detail below, the lead opinion cites to various decisions from this court and relies on the fact that the "record is devoid" of any evidence of the following indicators of substantial impairment: "falling, slurring speech, passing out, or vomiting" and any evidence from "[S.G. or] any other witness . . . as to any particular aspect of [S.G.'s] behavior that should have alerted McClain to her substantial impairment." Respectfully, I cannot join that conclusion. These factors are not the only indicators of substantial impairment — especially in situations where the victim was involuntarily drugged.

{¶ 59} Indeed, it is highly improbable that victims can testify about their state at the time of the sexual conduct or whether the perpetrator should have known that they were substantially impaired if they were drugged because they cannot remember. "Having your drink spiked without your knowledge or consent is commonly called 'being roofied.' And it can make sexual violence more likely." Cleveland Clinic, *Recognizing the Symptoms of Being Roofied*, https://health.clevelandclinic.org/symptoms-of-being-roofied (accessed Feb. 6, 2025) [https://perma.cc/ZF7H-Y5HY]. "The primary reason to roofie a person is to sedate them, making them an easier target for abuse." *Id.* "After being drugged,

it can be hard to tease apart whether you drank too much or you got roofied[.]" *Id.* These drugs "*impact your ability to think clearly and remember what happened. And they work fast, usually between 10 and 30 minutes after they're consumed.*" (Emphasis sic.) *Id.* Other symptoms include: nausea and vomiting, extreme drowsiness, headache, dizziness, loss of coordination and balance issues, confusion, disorientation and brain fog, slow response time and decision-making skills, and weakness or loss of muscle control. *Id.*

{¶ 60} Contrary to the lead opinion assertion, we are not to determine if the State "proved beyond a reasonable doubt" that McClain knew of S.G.'s impairment at the time of the sexual conduct. We are not tasked with a manifest-weight-of-the-evidence challenge and whether the State met its burden of persuasion. Accordingly, an appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Jones*, 2021-Ohio-3311, ¶ 10, citing *State v. Richardson*, 2016-Ohio-8448 ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386.

{¶ 61} Rather, our focus as the reviewing court in a sufficiency-of-the-evidence challenge is the burden of production. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). Our review is limited, and we do not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d at 387. It falls to the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jones* at ¶ 16. Thus, we are only to determine if the State's

evidence demonstrated that McClain "[knew] or ha[d] reasonable cause to believe that [S.G.'s] ability to resist or consent is substantially impaired because of a mental or physical condition[.]" R.C. 2907.02(A)(1)(c). It is my opinion that the State met its burden of production in this case.

{¶ 62} The State's theory throughout the case was that S.G. did not consent to having sex with McClain, S.G. may have been drugged on the night in question, and there are gaps in her memory. A review of the record reveals that S.G.'s testimony was clear up until the point in time where she was cornered by two men. According to S.G., she ordered a drink while sitting at the bar, waiting for her pizza. Shortly after she got her drink, she was approached by a man on her right who was hitting on her "pretty aggressively." (Tr. 364.) She "made some smart comments back about not being interested and then there was another person that came to [her] on [her left] side in a dark hoodie, like dark hair. [S.G.] wasn't really watching him because [she] was watching the guy that approached [her] the first time and that is all [she] remember[s]." (Tr. 364-365.) While S.G. was not able to identify McClain, she described the man on her left as "a little bit taller" than the man on her right, with "dark features, and a dark hoodie." (Tr. 384.) She could not give any further description because she "wasn't really looking at [her] left." (Tr. 384.) Notably, S.G.'s description of the man on her left is similar to McClain's — dark hair and dark features, which is something that the jury was able to observe. S.G. described the man on her right as "chubby and about five-foot-eight and looked very Arabic. He had a beard. Balding." (Tr. 383.)

{¶ 63} During this interaction, S.G.'s drink was in front of her. She described it as an "open drink in a short glass with some ice and lime." (Tr. 365.) When asked by the State if S.G. remembered how long she spoke with these men or what she discussed, S.G. replied that she did not remember. When asked how many drinks she had, all S.G. remembered was that she ordered one drink, but does not remember drinking it. She also does not remember if she picked up her pizza.

{¶ 64} The next thing that she does remember is being awakened by a good samaritan to find herself in a parking lot a mile away from her car during the early morning hours and in the middle of winter, "beaten up, with [her] pants unzipped and clearly violated," "bruising on [her] . . . left arm, and some marks on [her] face, like on [her] lips area, and a little blood," and a "sensation . . . [i]n [her] vagina." (Tr. 366.) She remembers it being dark, cold, and snowy, but had no idea what time it was because she was "[v]ery disoriented." (Tr. 369.) The good samaritan walked S.G. home, and S.G. remembers "being slumped into [her] couch and waking up the next morning."[4] (Tr. 371.) According to S.G., "[t]he whole night didn't make sense." (Tr. 372.) S.G. further testified she had flashbacks of that night and told investigators that she had a flashback of men in a car who pushed her out of the backseat and onto the ground. (Tr. 450-451.)

{¶ 65} S.G. remembers waking up sometime between 8:00 a.m. and 10:00 a.m. and calling her friend ("Friend"), who took her to the hospital later that day.

_____

[4] In her report to the SANE nurse, S.G. stated that she walked home barefoot.

Friend testified that S.G. "was upset" and "was crying." (Tr. 485.) She indicated to him that "she was out at a bar and like somebody was bothering her and had hurt her in some way." (Tr. 484.) According to Friend, S.G. could not specifically indicate in what way because "she wasn't sure herself what had happened but she was hurt, obviously, by somebody." (Tr. 484.) Based on his conversation with S.G., he "assume[d] sexual assault." (Tr. 485.)

{¶ 66} S.G. testified that she also called her mother and told her that she thought she was raped because she "woke up with [her] pants open. [She] woke up feeling this soreness in [her] vagina. There was a sensation in [her] body that just was off. The whole night didn't make sense. I had to go get my car. I was just getting a pizza." (Tr. 372-373.) S.G. additionally testified that her aunt ("Aunt") met her at the hospital. Aunt testified that her sister (S.G.'s mother) called her because she was living out of state at the time and told her that "[S.G.] had been attacked and was raped and was at Fairview Hospital." (Tr. 498.) Aunt spoke with S.G. after her examination. Aunt described S.G. as "pretty withdrawn. Quiet. . . . [Aunt] saw bruising on [S.G.'s] face and [she] remember[ed] there was a cut on [S.G.'s] lip. [Aunt did not] remember exactly where. But [S.G.] was pretty quiet and withdrawn." (Tr. 501.)

{¶ 67} S.G. was examined by a sexual assault nurse examiner ("SANE nurse") at the hospital at 7:30 p.m. S.G. told her that "I went to [the] pizza place to get pizza. While waiting for pizza had a couple vodka tonics. Talked with man beside me. Next thing I knew I was walking down street and couldn't remember last several hours. I

walked home. Noticed bruises and fat lip." (Tr. 519.) When asked about S.G.'s emotional status, the SANE nurse replied, "Tearful." (Tr. 519.) According to the SANE nurse, S.G. could not recall the assailants or what had transpired. Nor could S.G. recall if a condom was used. The SANE nurse testified that it was not unusual for individuals to not recall these things when drug or alcohol is involved.

{¶ 68} The SANE nurse testified that there were no vaginal injuries, which is normal in these examinations. S.G. did have a cut and swelling on her lip, a bruise on her right hip, and bruising on her knees and right elbow, with all the bruises appearing to be from the same night. On cross-examination, the SANE nurse acknowledged that those injuries could have been consistent with falling down and clarified on redirect that the fall could also be caused by someone drinking alcohol mixed with drugs as well.

{¶ 69} The SANE nurse further testified that, in the past, she personally did not collect "urine and blood to determine if there is any drugs or substance in the patient's system" if 12 hours or more elapsed since the alleged assault. (Tr. 512.) S.G. reported that the assault occurred sometime between midnight and 3:30 a.m., which would have been more than 12 hours since the assault and at the time of the exam (approximately 16 to 19 hours). On cross-examination, the SANE nurse acknowledged that either drugs or alcohol would cause a person to "black out." (Tr. 545.) Specifically, "[n]arcotics, benzodiazepines." (Tr. 546.) With regard to S.G. drinking "a couple of vodkas," the SANE nurse testified, "I'm most certain that I

wouldn't have thought a couple of vodkas would have made her black out for a few hours." (Tr. 546-547.)

{¶ 70} The SANE nurse collected vaginal, oral, and anal swabs from S.G. Evidence of McClain's DNA was present in S.G.'s vaginal swabs, which were collected within hours after the rape. According to the forensic scientist, the match to McClain had an estimated frequency of occurrence "rarer than 1 in 1 trillion unrelated individuals." (Tr. 592.)

{¶ 71} Katigbak's interview of McClain was played for the jury. During the interview, McClain was shown a photo of S.G. from the time period of the rape. McClain wrote on the photo that he did not recognize or know S.G. When asked if he ever had sex with S.G., McClain stated, "[N]o . . . that I can 100 percent tell you." (State's exhibit No. 23.) He also stated that "100 percent" S.G. has never been in one of his vehicles. (State's exhibit No. 23.) According to Katigbak, when asked if McClain's DNA would be in S.G.'s sexual-assault kit, McClain stated that "it would not be in there. [McClain] did not recognize [S.G.] or have sexual affairs with her." (Tr. 707.) McClain admitted to going to Common Grounds and was familiar with the area where the rape occurred, but denied going to the Third Place and denied drinking or regularly going to any of the other bars in the area. Specifically, McClain stated he "really didn't hang out at bars in 2010, it was mainly people's houses" and when asked if he ever went to the Third Place, McClain responded, "No, I've never actually been inside that place." (State's exhibit No. 23.)

{¶ 72} Katigbak further testified he created a photo lineup that included McClain's picture and showed it to S.G.  S.G. did not identify McClain, selecting a different person from the photo array instead, testifying that he resembled "the last face that [she] saw at the bar the night before everything happened."  (Tr. 379.)  "As far as [S.G.] knew," that was the person who assaulted her.  (Tr. 379.)  On cross-examination, Katigbak acknowledged that McClain does not resemble the man S.G. described as heavyset and with curly hair.  Katigbak testified that McClain was approximately 21 years old in 2010.

{¶ 73} Additionally, McClain's "wife" testified that back in 2010, McClain was her "best friend," and they would hang out with their group of friends at Common Grounds, a 24-hour coffee shop in the West Park area, either before or after they went out.  (Tr. 748.)  They "would all meet at Common Grounds and then [they] would disperse to the bars from there."  (Tr. 747.)  "There was a lot of drinking" at that time.  (Tr. 748.)  They would get drunk and then go to Coffee Grounds afterwards.  According to McClain's "wife":

> We all used the coffee shop after the bars because at the time Steak 'n Shake was open so we can go to Steak 'n Shake, grab something to eat, take it back to the coffee shop because it was open 24 hours and it also served coffee as well, so that way nobody — everybody was trying to sober up so we can all go home.

(Tr. 749-750.)  McClain and his "wife" "could be up there until six o'clock in the morning[.]"  (Tr. 750.)  "Wife" further testified that it was not unusual for McClain to "hookup" with a stranger he met at the bar that night.  (Tr. 754.)  Notably, the evidence at trial revealed that the KeyBank parking lot where S.G. was found is

"three store fronts" down from Common Grounds in the same shopping center, sharing "the same parking lot." (Tr. 704-705.) Wife testified on cross-examination that if McClain told law enforcement that "in 2010, [he] didn't regularly go to bars, did not regularly drink, [and] would only hang out in that area to go to the coffee shop only," that would have been a lie. (Tr. 767.)

{¶ 74} R.C. 2907.02(A)(1)(c) requires that "the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition[.]" The phrase "substantially impaired" "is not defined in the Ohio Criminal Code, [and] must be given the meaning generally understood in common usage." *Zeh*, 31 Ohio St.3d at 103. According to the Ohio Supreme Court, substantial impairment is established by "demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [their] conduct or to control [their] conduct." *Id*. at 104. It is important to note that ""[a] substantial-impairment determination is made on a case-by-case basis, with great deference to the factfinder."" *State v. Jones*, 2021-Ohio-4117 at ¶ 48, quoting *State v. Kaufhold*, 2020-Ohio-3835, ¶ 16 (12th Dist.), quoting *State v. Kilbarger*, 2014-Ohio-2341, ¶ 11 (12th Dist.). And as the lead opinion acknowledges, it can be proved through the victim's own testimony. *Brady*, 2007-Ohio-1453, ¶ 78. "Substantial impairment may also be proven 'by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct.'" *Jones* at ¶ 48, quoting *State v. Z.G.B.*, 2016-Ohio-7195, ¶ 15 (12th Dist.).

{¶ 75} "A person acts knowingly . . . when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Whether a person acted 'knowingly' is inferred from the totality of the circumstances surrounding the alleged offense." *State v. Keller*, 2018-Ohio-4107, ¶ 21 (8th Dist.), citing *State v. Booth*, 133 Ohio App.3d 555, 562 (10th Dist. 1999). Moreover, it well established that "'[f]acts may be proved by circumstantial evidence as well as direct evidence or any combination and both types of evidence have equal probative value.'" *State v. Jones*, 2021-Ohio-4117, ¶ 50 (12th Dist.), quoting *State v. Rose*, 1985 Ohio App. LEXIS 9051, *13-14 (12th Dist. Oct. 28, 1985).

{¶ 76} Here, the court instructed the jury on direct and circumstantial evidence and inference stacking. The court advised:

> Evidence may be either direct or circumstantial or a combination of both. Direct evidence is testimony given by a witness who's seen or heard the facts to which he or she has testified. It includes the exhibits accepted as evidence during the trial and any stipulations. It is also known as direct, positive, or eyewitness testimony.
>
> It is not always possible, however, to ascertain the truth by evidence of this direct character, thus, the law permits the introduction and consideration of what is called circumstantial evidence. By circumstantial evidence, we mean proof of certain facts and circumstances from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of humanity.
>
> You are instructed, however, that you are not permitted to base one inference upon another inference. Each inference must be predicated or based upon a proven fact or facts. Two or more inferences may be drawn from the same proven facts or additional facts in evidence or circumstances in evidence. In the absence of direct evidence, circumstantial evidence by itself may justify the finding of guilty.

(Tr. 867-868.)

{¶ 77} While Ohio law "precludes the stacking of inferences to prove a claim," the trier of fact may consider an inference based upon a proven fact or facts. *State v. Brown*, 2018-Ohio-3674, ¶ 18 (8th Dist.). Furthermore, if the second inference is based in part upon another inference and in part upon facts, it is a parallel inference and, if reasonable, is permissible. *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph two of the syllabus; *see also State v. Jordan*, 2002-Ohio-1418 (3d Dist.); *State v. Cassidy*, 1990 Ohio App. LEXIS 818, *15 (10th Dist. Mar. 6, 1990), quoting *McDougall v. Glenn Cartage Co.*, 169 Ohio St. 522 (1959), paragraph two of the syllabus; *State v. Schatzinger*, 2021-Ohio-167, ¶ 46 (3d Dist.). Similarly, it is "permissible for a jury to draw several conclusions or presumptions of fact from the same set of facts and equally permissible for a jury to use a series of facts or circumstances as a basis for ultimate findings or inferences." *Id.* at paragraph three of the syllabus.

{¶ 78} In this case, the jury found, common sense dictates, and the lead opinion assumes, for the sake of argument, that S.G. was substantially impaired at the time of the sexual conduct. S.G. suffered from memory loss and testified that she was "very disoriented" and the entire night did not "make sense"— all indicators of being drugged and, therefore, substantially impaired. S.G. also sustained injuries consistent with "falling down," a fact that was not in dispute and another indicator of substantial impairment.

{¶ 79} The lead opinion, however, relies on *Doss* and *Noerenberg*, and focuses on the lack of evidence alerting McClain to S.G.'s substantial impairment as the basis to sustain McClain's argument. The lead opinion's focus is misplaced and these cases are distinguishable. As mentioned above, "falling, slurring speech, passing out, or vomiting" are not the only indicators. Moreover, *Doss* and *Noernberg* both involve situations where the evidence was clear that the victim was intoxicated from excess alcohol consumption and the perpetrator was also drinking or did not deny being in the bar with the victim.

{¶ 80} In *Doss*, the victim stated she did not remember anything, which the court found "is not evidence that she did not consent to the sexual encounter or that appellant knew that she may have been substantially impaired." *Doss*, 2008-Ohio-449 at ¶ 21. In *Doss*, there was testimony by the bartender that the victim "was carrying on multiple conversations with appellant, [appellant's girlfriend], and [the bouncer at the bar]. The bartender testified that she had state training as a bartender to recognize stages of intoxication, and that on a scale of one to four, [the victim] was a three." *Id.* at ¶ 22. This court concluded that the

> evidence shows that appellant had consensual sex with a woman who had been drinking alcohol, albeit while his girlfriend was in the other room. Appellant gave a detailed description of [the victim's] consensual conversation with him, and [the victim] not only being aware, but being in control, of her actions. From all accounts, and as strange as this "good Samaritan" scenario may seem, [the victim's] decision to go home and sleep with appellant was just as voluntary as her intoxication on New Year's Eve.

*Id.* at ¶ 25.

{¶ 81} In *Noernberg*, the victim and the defendant smoked marijuana and drank beer together while hanging out at defendant's house. According to the victim, the defendant insisted that she perform oral sex on him. The victim testified that she did not want to but ultimately performed oral sex because she had nowhere else to go. This court found insufficient evidence of substantial impairment rape because

> beyond the amount of alcohol and marijuana [the victim] had consumed, the State failed to present any evidence as to her substantial impairment. And although [the defendant] knew that [the victim] had consumed the alcohol and drugs, there is no evidence to indicate that he should have known that her ability to resist or consent was substantially impaired by consuming them. There was no evidence of any particular aspects of [the victim's] behavior that should have alerted [the defendant] to her substantial impairment, such as stumbling, falling, slurred speech, passing out, or vomiting.

*Noernberg*, 2012-Ohio-2062 at ¶ 27.

{¶ 82} Whereas, the instant case involves drugging, not excess alcohol consumption, and McClain denied having sex with S.G., denied drinking, and denied ever frequenting the Third Place. S.G. was surreptitiously drugged and testified on multiple occasions that she did not consent to having sex that night and she did not intend to have sex that night. Additionally, there is no testimony from other witnesses as to S.G.'s demeanor or state-of-being like there was in *Doss*. Nor was there any testimony from S.G. as to the entire sequence of events that transpired on the night in question as in *Noernberg*. Moreover, the dissent in *Doss* aptly stated:

> Here, the State offered evidence that the victim was in an alcohol-induced blackout and that the defendant, the bouncer, and the bartender recognized her as being intoxicated. The victim maintains

that a "black curtain" came down on her at the club and remembers nothing until waking the next morning in a strange bed. While it is fair and certainly appropriate for the defense to argue that the victim engaged in consensual intercourse due to an alcohol-induced state of "lowered inhibitions" rather than being unable to consent or resist, it is not for the court to decide this factual point.

*Id.* at ¶ 29.

{¶ 83} Respectfully, I disagree with the lead opinion's conclusion. I would find that the testimony, if believed also demonstrates that McClain knew or had reasonable cause to know of S.G.'s substantial impairment. Indeed, there was no evidence that S.G. acted normally and there was no evidence that McClain was substantially impaired. Rather, the evidence indicates that S.G. was drugged when she was cornered by McClain, who similarly looks like S.G.'s description, and the other male, who distracted S.G., while drugs were slipped into her drink as she waited for her pizza. These types of drugs typically take between 10 and 30 minutes to take effect, which is approximately the same time it takes to pick up a pizza. A "date rape drug or a drug that would render someone unconscious . . . [is] generally very fast acting and clear[s] out of the body very quickly." *Torres*, 2016-Ohio-3061 at ¶ 21. Moreover, McClain told investigators that he was not drinking alcohol at that time in his life. "Wife" testified that, in 2010, McClain drank and would frequently hangout at Common Grounds after going out for the night and it was not unusual for McClain to "hookup" with a stranger he met at the bar. The evidence at trial revealed that the KeyBank parking lot where S.G. was found is three store fronts

down from Common Grounds in the same shopping center, sharing the same parking lot.

{¶ 84} From these facts, the jury could have reasonably inferred that McClain was aware that S.G. was drugged, rendering her unable to consent, raped her, and then left her in the KeyBank parking lot, which is next to the coffee shop he frequented. For the jury to conclude this, it did not require an inference upon an inference. Rather, the jury was permitted to make reasonable parallel inferences — that is, the jury was permitted to draw several conclusions or presumptions of fact from the same set of facts and was equally permitted to use a series of facts or circumstances as a basis for ultimate findings or inferences. *Hurt* at paragraph three of the syllabus.

{¶ 85} Furthermore, whether S.G. fell or was pushed out of the car and whether she had one drink that night as opposed to two or three, are questions appropriate on a manifest-weight-of-the-evidence challenge, not a sufficiency challenge, which is the focus of the matter before us. It is within the jury's province to decide if she was substantially impaired or intoxicated by alcohol or drugs. A determination is made on a case-by-case basis, with great deference to the factfinder, and permits the factfinder to obtain its own assessment of the victim's ability to either appraise or control her conduct. *Jones*, 2021-Ohio-4117 at ¶ 48. What is clear is that S.G. did not consent to having sex that night and McClain's DNA is in her vagina without any evidence presented as to how that occurred.

{¶ 86} When viewing the foregoing evidence in a light most favorable to the State, as this court is required to do, the totality of the circumstances leads to one conclusion — McClain knew or had reasonable cause to believe that S.G. was substantially impaired at the time of the sexual conduct. It is not within the scope of this appeal to speculate about why the jury found McClain not guilty of forcible rape and guilty of substantial impairment rape.

{¶ 87} Lastly, the lead opinion contends that they have not found that McClain and S.G. had consensual sex, but rather "the forensic evidence demonstrates that sexual conduct occurred between victim, and McClain, but the details, as required for substantial impairment rape conviction, are insufficient." Respectfully, their contention that the sexual conduct was not consensual, but at the same time the conduct was insufficient for rape, is circular and conflicts with McClain's theory at trial. By contending that there is insufficient evidence of rape, the lead opinion is implying that the sexual conduct was consensual, which is in direct contradiction to S.G.'s testimony that she had no memory of engaging in any sexual act as well as not having a consensual sexual act with anyone that night, particularly after she had just finished working the closing shift at two restaurants, was hungry, and was looking forward to getting back home. Common sense dictates that consensual encounters do not end with someone awaken by a stranger in the middle of a cold, winter night, disoriented, with one's pants unzipped, with no shoes on, a burning sensation in one's vagina, and bloody and bruised, having to walk over a mile home.

**{¶ 88}** Thus, for the foregoing reasons, I would overrule the first assignment of error.

### Ineffective Assistance of Counsel

**{¶ 89}** With regard to the second assignment of error, the lead opinion sustains McClain's contention that defense counsel was ineffective for failing to object to hearsay testimony by S.G., Friend, and Aunt, finding that this testimony was "prejudicial; that is, it impermissibly filled in the gaps of lacking evidence, especially [S.G.'s] testimony, who was unable to state the particulars of the incident."

**{¶ 90}** To establish ineffective assistance of counsel, McClain must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland*, 466 U.S. 668 at 687. The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

**{¶ 91}** Furthermore, I am mindful that in Ohio, every properly licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Davis*, 2021-Ohio-4015, ¶ 25 (8th Dist.), citing *State v. Black*, 2019-Ohio-4977, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). When evaluating counsel's performance on an ineffective-assistance-of-counsel claim, the court "must indulge a strong

presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see State v. Powell*, 2019-Ohio-4345, ¶ 69 (8th Dist.), quoting *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable-professional judgment.'").

{¶ 92} "'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶ 93} McClain first argues that defense counsel's "most glaring error" was allowing S.G. to testify about her personal investigation of the case:

> I went to The Third Place. I spoke with the bartender . . . . She mentioned that this incident had happened with her. We shared a conversation about that. I asked her if there were any cameras that could corroborate where I was, who I left with. I asked if I got my pizza. I asked if I paid for it. She could not answer any of those. There was no video. She mentioned the owner was just in the process of putting them and installing them because there were a few other girls that had reported being roofied and I asked for the owner to call me. I also called and left a message for him and never received a call back.

(Tr. 376-377.)

{¶ 94} McClain argues that defense counsel should have objected to this testimony as it is hearsay. The fact that defense counsel did not object to this testimony, however, is not enough to conclude that defense counsel was ineffective because S.G.'s testimony was not hearsay. A review of the transcript reveals that S.G.'s testimony was in response to the following question by the State: "After

leaving the hospital, what did you do yourself?" (Tr. 376.) I would find that this testimony is the conclusion S.G. reached in her own investigation, which was necessary to explain why S.G. took certain actions. *State v. Anthony*, 2021 Ohio App. LEXIS 1682, *11 (5th Dist. May 21, 2021). S.G.'s testimony is akin to a police officer's testimony explaining the steps taken in an investigation. *Id.*, citing *Moore,* 2016-Ohio-828 at ¶ 75, citing *State v. Tanner*, 2003-Ohio-6866, ¶ 12 (5th Dist.). Moreover,

> [t]he admission of unfavorable evidence at trial does not establish ineffective assistance of counsel. All evidence is prejudicial to the opposing party in the sense that all evidence is unfavorable to the party against whom it is introduced. *State v. Kilbarger*, 5th Dist. Fairfield No. 13-CA-64, 2014-Ohio-4949, ¶ 39. . . . We recognize tactical decisions, such as whether and when to object, ordinarily do not give rise to a claim for ineffective assistance. *State v. Miner*, 2020-Ohio-5600, 164 N.E.3d 512, ¶ 24 (5th Dist.), citing *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 139-140. Thus, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988).

*Id.* at *13.

{¶ 95} It appears from the record that defense counsel understood this testimony was not utilized to prove the truth of the matter asserted and, as a result, defense counsel did not object. Moreover, defense counsel may have sought not to draw further attention to S.G.'s investigation, and upon cross-examination focused upon the lack of the toxicology report. "Reviewing courts 'will ordinarily refrain from second-guessing strategic decisions' by trial counsel — even where trial counsel's strategy was 'questionable' or 'debatable' or, in hindsight, it looks like a

better strategy was available or other counsel would have defended against the charges differently." *State v. Debose*, 2022-Ohio-837, ¶ 23 (8th Dist.), citing *State v. Myers*, 2002-Ohio-6658, ¶ 152; *State v. Ford*, 2018-Ohio-3563, ¶ 34 (8th Dist.); *State v. Vinson*, 2016-Ohio-7604, ¶ 37 (8th Dist.). Lastly, I note that McClain retained counsel, and thus, has the right to have retained counsel of his choosing. *State v. Hill*, 2019-Ohio-1647, ¶ 13 (8th Dist.) To this end, he could have chosen to dismiss retained counsel if he was in any way dissatisfied with counsel's representation. *Id.*, citing *State v. Curtis*, 2018-Ohio-2822, ¶ 33 (5th Dist.).

{¶ 96} However, even if I were to agree with the lead opinion and find that the testimony in question was prejudicial, I still would not find ineffective assistance of counsel because the admission of this testimony did not deprive McClain of a fair trial. As discussed above, there is sufficient evidence to sustain his rape conviction without this testimony.

{¶ 97} McClain next argues that defense counsel was ineffective for failing to object to (1) Friend's testimony that S.G. had indicated that she was "hurt, obviously, by somebody" and that he "assume[d] sexual assault" (tr. 484-485) and (2) Aunt's testimony that her sister called her and told her that "[S.G.] had been attacked and was raped and was at Fairview Hospital." (Tr. 498.) McClain claims that by eliciting improper hearsay from these two lay witnesses, the State attempted to shore up the allegation that S.G. was "raped" rather than having engaged in consensual sex.

{¶ 98} These statements, however, are not hearsay because they were not utilized to prove the truth of the matter asserted, but rather to explain Friend's and

Aunt's understanding of the situation and the reasons why they took the actions that they did. Thus, just as with S.G.'s testimony, I would likewise find that defense counsel's failure to object to this testimony does not constitute ineffective assistance of counsel.

**Victim-Impact Testimony**

{¶ 99} With regard to the third assignment of error challenging "impermissible" victim-impact testimony, the lead opinion finds this error moot in light of its disposition of the first and second assigned errors. I would address this assigned error.

{¶ 100} McClain argues the court abused its discretion when it permitted the State to present S.G.'s victim-impact testimony, which the State then relied on to support McClain's conviction. McClain contends that this evidence prejudiced him and resulted in an unfair trial. We note that the admission or exclusion of evidence lies in the trial court's sound discretion and "'unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.'" *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984), quoting *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 101} Specifically, McClain challenges the following testimony after the State asked S.G. how this incident affected her and S.G. replied, "My mental health.

Self-esteem.  Being able to have healthy relationships.  Trust.  Just it affects you in a soul level and you want answers and, you know, it's just — it's just soul crushing.  I really haven't a word for it.  It's more of a feeling and a state of being that you just become through life." (Tr. 384-385.)  The State elicited testimony from Aunt, who stated that S.G. "was a very outgoing and energetic person before this happened" and now she is "quieter."  (Tr. 503.)  Friend also testified he noticed changes and that S.G. "would like close herself off, even from me." (Tr. 486.)  McClain contends that this testimony is not relevant to his "alleged guilt and does not prove any element of the rape offenses he was charged with."

{¶ 102} This court has held that a victim may testify "as to how a crime has impacted their lives 'particularly when the "circumstances of the victims are relevant to the crime as a whole.""" *State v. Butts*, 2020-Ohio-1498, ¶ 43 (8th Dist.), quoting *State v. Priest*, 2007-Ohio-5958, ¶ 41 (8th Dist.), quoting *State v. Williams*, 2003-Ohio-4164.  The State is not wholly precluded from eliciting testimony from victims that touches on the impact the crime had on the victims:  "'circumstances of the victims are relevant to the crime as a whole.  The victims cannot be separated from the crime.'"  *Williams* at ¶ 43, quoting *State v. Lorraine*, 66 Ohio St.3d 414, 420 (1993).  "The emotional scars of sexual abuse are as real as the physical scars caused by physical assaults.  Just as the victim of a felonious assault may testify to the treatment needed as a result of the assault in order to prove that the assault actually did occur, so may the victim of a sexual assault testify to the lingering trauma suffered as a result of that abuse."  *State v. Eads*, 2007-Ohio-539, ¶ 56 (8th Dist.),

citing *State v. Gus*, 2005-Ohio-6717 (8th Dist.). Additionally, victim testimony is admissible at trial to the extent that it "'relat[es] to the facts attendant to the offense[.]'" *State v. Clinton*, 2017-Ohio-9423, ¶ 126, quoting *State v. Fautenberry*, 1995-Ohio-209.

{¶ 103} Contrary to McClain's assertion, I would find that the above-testimony was introduced to prove that S.G. had been violated by nonconsensual sexual conduct while she was substantially impaired. The contested testimony is not an unnecessary characterization of McClain himself, or of the incident, but rather is a relevant description of the effect this incident had on S.G. and depicts the entirety of the incident. S.G. cannot be separated from the crime and the lingering trauma she suffered because she has no recollection of what transpired that night. Thus, I cannot say that this evidence confused the issues or misled the jury. As a result, I would not find that the court abused its discretion when it allowed this testimony.

{¶ 104} Finally, I must express my concern with the lead opinion. As written, it has the unintended consequence of effectively eviscerating R.C. 2907.02(A)(1)(c) and placing the State in the untenable situation of having to prove substantial impairment rape in situations where the victim was substantially impaired, i.e., drugged, which resulted in memory loss, and there is no evidence regarding the perpetrator actually drugging the victim, "testimony about the victim's state at the time of the sexual conduct," or testimony from the victim, claiming that the perpetrator "knew or should have known that [the victim] was substantially impaired." The onus is not on S.G. to "claim in her statement at the hospital or later

to the police that McClain knew or should have known that she was substantially impaired." Particularly in situations like the instant case, where the only testimony is from the victim who, while sitting down to have a drink as she waited for a to-go order was cornered by two men and the next thing she remembers is being woken up by a good samaritan to find herself in a parking lot a mile away from her car during the early morning hours and in the middle of winter, barefoot, "beaten up, with [her] pants unzipped and clearly violated," "bruising on [her] . . . left arm, and some marks on [her] face, like on [her] lips area, and a little blood," and a "sensation . . . [i]n [her] vagina." (Tr. 366.)

{¶ 105} Therefore, based on the foregoing, I would overrule McClain's three assigned errors and affirm his rape conviction.